J-S28029-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.G.S. AND M.R.S., MINORS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.S., NATURAL FATHER | : | |
| | : | |
| | : | No. 1880 WDA 2016 |

Appeal from the Order Entered November 7, 2016
In the Court of Common Pleas of McKean County
Orphans' Court at No(s):  42-15-0107/42-15-0107-1

BEFORE:   OLSON, MOULTON, and STRASSBURGER[*], JJ.

MEMORANDUM BY MOULTON, J.:                     **FILED JUNE 06, 2017**

S.S. ("Father") appeals from the November 7, 2016 orders granting the petitions filed by the McKean County Children and Youth Services ("CYS"), and involuntarily terminating his parental rights to his children, A.G.S., born in June 2013, and M.R.S., born in September 2014, ("Children"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b).  We affirm.[1]

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] In separate orders entered on that same date, the trial court terminated the parental rights of Children's mother, M.M. ("Mother"). Mother has filed a separate appeal from the termination of her parental rights at Docket No. 1881 WDA 2016, which we address in a separate memorandum.

Both Mother and Father ("Parents") have a lengthy history of drug abuse and incarceration.[2] *Id.* The trial court found the following facts:

> [M.R.S.] was in the care of her Parents until September of 2014. [A.G.S.] was born addicted to Methadone. CYS was notified by medical providers regarding [A.G.S.'s] condition[,] and CYS initiated an investigation shortly after her birth and before she was released by the hospital. CYS filed Petitions for Dependency on September 29, 2014. Several hearings were held to address the Dependency Petitions and to review the status of the dependency cases following disposition.

Tr. Ct. Memorandum and Order, 11/7/16, at 1 (unpaginated) ("Termination Op.").[3]

The trial court adjudicated Children dependent on October 6, 2014 and CYS placed Children in the care of B.L. ("Foster Mother") and M.L. ("Foster Father") (collectively, "Ls" or "Foster Parents"). Children remain in the care of Foster Parents, *id.* at 10, and Children were doing well in their care, *id.* at 3.

_____

[2] Prior to A.G.S. being removed from Parents' care and custody, Father, Mother, and A.G.S. resided with M.S. ("Paternal Grandmother"). Tr. Ct. Memo. and Order, 11/7/16, at 8 (unpaginated). Paternal Grandmother provided the majority of the care for A.G.S. Paternal Grandmother has health issues and is unable to provide care for either of the Children. *Id.* For a complete discussion of the case's factual and procedural history, see the trial court's memorandum and order filed on November 7, 2016.

[3] The trial court entered a separate memorandum and order for each child, with two orders attached to each memorandum, one regarding each parent. The memoranda are identical with regard to the portions that we cite and quote herein.

On April 28, 2015, CYS filed petitions seeking to involuntarily terminate the parental rights of Mother and Father to Children, and filed amended petitions on November 19, 2015. The trial court held evidentiary hearings on the petitions on July 31, 2015; December 2, 11, 14, and 18, 2015; January 25 and 26, 2016; and July 15, 2016.[4]

The trial court found the following from the testimony of Foster Parents:

> The court finds the testimony of [Foster Mother] credible. [The Ls] live in McKean County. They have been married for over 29 years. They have served as foster parents since October 2001. [A.G.S.] was placed with them in October of 2014. [M.R.S.] was placed with them shortly after her birth and when she was discharged from the hospital. The [Ls] have provided exceptional care for [Children]. [Foster Father] obtained training to recognize and address issues that [A.G.S.] may have due to being born drug addicted. The [Ls] have taken both children to their medical appointments. The [Ls] offered to allow the parents to call their home to obtain information regarding [C]hildren. Mother has called at times. However, "it depends on where she is." Mother has gone several weeks and even months without calling the [Ls]. Mother has sent "about 5 letters and cards" to the [Ls] for [C]hildren. Mother has also sent gifts for [C]hildren to the [Ls]. Mother attended a birthday party for [M.R.S.] that the [Ls] had on June 26, 2015. Mother also attended a visit at the [Ls] on August 16, 2015; and, according to the [Ls], Mother's attendance at the birthday party and the August 2015 visit was "completely appropriate." Father has only called the [Ls] once.

_____

[4] In its memorandum and orders, the trial court summarized the testimony from these hearing dates, and identified the testimony that it found credible and that which it did not. *See* Termination Op. at 1-16.

[Children] are very bonded with the [Ls] and their children. The girls recognize the [Ls] as their primary caretakers and are very affectionate toward them. The [Ls] "adore those girls" and would adopt them if that is an option.

. . .

The court finds the testimony of [Foster Father] credible. [Foster Father] reaffirmed the testimony provided by [Foster Mother]. He explained that [M.R.S.] was discharged to his care [from] the hospital after he attended a program on how to provide for a child that was born drug dependent. He explained that he and/or his wife take the girls to their medical and other necessary appointments. He indicated that parents have not attended any of the medical appointments that he has taken the girls to[]. He explained that he "loves these kids" and he and his wife would adopt them if that is an option.

Termination Op. at 10.

The trial court found the following credible from the testimony of the

CYS caseworker, Denise Butler:

[Butler] was assigned as the caseworker for [Children] in November of 2014. When she was first assigned to these cases Mother was still incarcerated and Father was still residing with [Paternal Grandmother], in Port Alleghany, PA.

. . .

The first contact that caseworker Butler had with Father was following a dependency review hearing. She established a visitation with Father. Father attended the first 3 visits. After that, which was in January 2015, Father indicated that he was working out of the area and the visits would have to be scheduled when he was available, which was often only on the weekends. Therefore, he had very few visits with [C]hildren. Out of 13 visits scheduled 5 were cancelled. Caseworker Butler testified that Father never attended any of the medical

appointments for [C]hildren. Father failed to maintain contact with the employees at Parents as Teachers. Therefore, because of the lack of contact and the missed visits, Parents as Teachers closed out their case with this family. Father was required as part of the initial reunification plan to obtain an updated drug and alcohol evaluation[.]

Caseworker Butler asked Father to provide a urine sample during their first meeting following a court hearing in November 2014 and many times thereafter. Father had numerous positive urine screens (positive for the presence of non-prescribed controlled substances). Father would often advise caseworker Butler what substances would likely be detected by the test, that "it was going to be dirty," and the test normally confirmed what he had indicated. Caseworker Butler would ask Father "if he was prescribed anything and he would say 'no.'" It was common for the results to be positive for opiates and suboxone.

The reunification plan for Father always included a requirement that he refrain from utilizing non-prescribed controlled substances and obtain an updated drug and alcohol evaluation. Caseworker Butler spoke to Father about that and Father indicated he was going to obtain an evaluation but he did not do so. In February of 2015 he said he was about to obtain insurance coverage and then he would obtain the evaluation. In June of 2015 he was ordered as part of a sentence for a DUI conviction to obtain an updated evaluation and he did so, but only after being under the threat of his criminal supervision being violated if he failed to do so. Father was required to obtain appropriate housing and he failed to do so.

Regarding the bond between Parents and the [C]hildren Caseworker Butler testified that it was similar to the relationship "with a babysitter." She explained "they ([C]hildren) are familiar with them, they are not scared of them, I mean not interact with them, but like taking [M.R.S.] from the [Ls,] she cries every time I want - I come to pick her up and she reaches for them (Ls/Foster [P]arents) because she doesn't want to go out the door. She doesn't want to go with [Father and Mother]."

J-S28029-17

*Id.* at 12-13.

As noted above, on November 10, 2016, the trial court entered the memorandum and orders granting the petition for involuntary termination of the parental rights of Father to Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b).[5]

On December 7, 2016, Father timely filed a notice of appeal. In his brief on appeal, Father raises one issue:

> Did the Honorable court below err when it terminated Father's parental rights despite a lack of competent evidence regarding the nature of the bond between Father and his children[,] and whether or not severance of that bond would be harmful to the Children?

Father's Br. at 7.

In reviewing an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of

---

[5] The orders were dated as filed on November 7, 2016. Notice was not sent to the parties until November 10, 2016.

- 6 -

discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As we discussed in [*In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that

the asserted grounds for seeking the termination of parental rights are valid.

***In re R.N.J.***, 985 A.2d 273, 276 (Pa.Super. 2009).  We have explained:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.*** (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa.Super. 2003)).

The trial court terminated Father's parental rights under subsections 2511(a)(1), (2), (5), and (b).[6]  In his brief, Father argues:

> Importantly, the eight-day record of testimony is devoid of any evidence that NO bond exists between Father and either daughter.  Likewise, there is no evidence of an unhealthy bond.  Finally, the record contains no evidence that either or both children will not be harmed by the severance of a bond.

Father's Br. at 10 (emphasis in original).  Father states that the trial court relied only on the caseworker's opinion that Children are bonded with their foster parents.  Father states that he was involved in caring for the older child, A.G.S., after she was born in June 2013 until she was placed in foster care in October 2014.  Father admits that any bond between M.R.S. and him

_____

[6] Although the trial court's orders do not expressly state that Father's parental rights are terminated under section 2511(b), the trial court discussed section 2511(b) and the case law pursuant to that section, and found it applicable in terminating Father's parental rights.  ***See*** Termination Op. at 18-21.  On appeal, Father is not challenging the failure of the order to expressly provide that his parental rights were terminated under section 2511(b).

would be less than the bond between A.G.S. and him, but he argues that he maintained the same visitation schedule with both Children, such that some degree of bonding was likely to occur. *Id.* at 17. Father contends that, because CYS failed to present sufficient evidence regarding bonding, this Court should reverse the termination order. *Id.* at 18.[7]

Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

We have stated that:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however,

_____

[7] On appeal, Father does not challenge the termination of his parental rights under subsections 2511(a)(1), (2), and (5), and we need not address those provisions here. We note, however, that the trial court's finding that termination was proper under subsection 2511(a) was supported by the evidence and was not an abuse of its discretion. *See* Termination Op. at 17-21; 23 Pa.C.S. § 2511(a)(1), (2), (5).

provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quotation marks and citations omitted) (quoting *In re N.A.M.*, 33 A.3d 95, 103). Further, when evaluating a parental bond,

> the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P.,* 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

We have explained that "[a] parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P.*, 994 A.2d at 1121. Further, this Court has stated: "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent,

- 10 -

healthy, safe environment." ***In re B.,N.M.***, 856 A.2d 847, 856 (Pa.Super 2004). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." ***In re Adoption of C.L.G.***, 956 A.2d 999, 1007 (Pa.Super. 2008) (citing ***In re Z.S.W.***, 946 A.2d 726, 732 (Pa.Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." (citation omitted))).

Here, the trial court stated:

> The court finds that the bond between Parents and [C]hildren is limited. As caseworker Butler testified [C]hildren's relationship with Parents is similar to the relationship between a child and a babysitter[;] they recognize Parents and are not afraid to be with them, but they do not recognize them as their primary caretakers. [C]hildren have resided with the [Foster Parents] for over two years and they therefore recognize them as their primary caretakers. [C]hildren have a very strong bond with the [Foster Parents,] and it would be harmful to them to severe that bond.
>
> . . .
>
> [T]he court also finds that [M.R.S.] and [A.G.S.] have a very limited bond with Parents and have a very strong bond with their foster parents, the [Ls]. The [Ls] have provided exceptional care for [C]hildren and they intend on adopting them if that is an option. Therefore, termination of parental rights will best serve the needs and welfare of [C]hildren.

Termination Op. at 21.

We conclude that the record supports the trial court's factual findings, and the court's conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of S.P.***, 47 A.3d at 826-27. Accordingly, it

- 11 -

was proper for the trial court to find that termination of Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of Children. We, therefore, affirm the orders terminating Father's parental rights with regard to Children.

Orders affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/6/2017